UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TAMICA BRANSCUMB,

    Plaintiff,

v.

HORIZON BANCORP, INC.,

    Defendant.

_____/

Case No. 1:23-cv-53

Hon. Hala Y. Jarbou

## **OPINION**

Plaintiff Tamica Branscumb brings a claim of race discrimination under 42 U.S.C. § 1981 and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") against Defendant Horizon Bancorp, Inc. Before the Court is Horizon's motion for summary judgment (ECF No. 53). For the reasons herein, the Court will grant the motion and dismiss the case.

### I. BACKGROUND

The following is a summary of the evidence with the facts construed in a light most favorable to Branscumb and drawing all reasonable inferences in her favor. Branscumb is an African American woman. (Branscumb Aff., ECF No. 56-4, PageID.697.) She opened checking and savings accounts with Horizon in December 2020. (12/29/2020 Checking Account Agreement, ECF No. 54-1; 12/29/2020 Savings Account Agreement, ECF No. 54-2; Branscumb Dep. 13-17, ECF Nos. 54-19, 56-6.) Seven months later, Horizon shut down the checking account because it was overdrawn, meaning there was not enough money in the checking account to cover the checks she had written. (Branscumb Dep. 17-18.)

On July 30, 2021, Branscumb went to a Horizon branch on Niles Road in St. Joseph, Michigan, to address the issue. There, a customer service representative named Kayla Betker helped her open a new checking account, called a "Fresh Start" checking account. (*Id.* at 19-20,

26; 7/30/2021 Checking Account Agreement, ECF No. 54-4; 8/22/2021 Account Statement, ECF No. 54-9.) Branscumb knew Betker by name because Betker often assisted Branscumb when Branscumb came into the bank. (*Id.*) After opening the new account, Branscumb repeatedly overdrew on it, resulting in negative account balances. (Account Statements, ECF No. 54-9, PageID.461, 465, 468; Branscumb Dep. 27-28.)

### A. Branscumb Deposits Settlement Check to Checking Account (March 23, 2022)

In March 2022, Branscumb received a check for $22,616.44 in connection with the settlement of a lawsuit. (Branscumb Dep. 30-31.) She had never before deposited an amount that large into her account. (*Id.* at 31.) As of March 22, her checking account balance was approximately $5.00 (*See* Account Statements, ECF No. 54-9, PageID.472.) On March 23, 2022, she went to the Niles Road branch to deposit her check. As before, Betker assisted her. (Branscumb Dep. 32.)

Horizon had policies in place for assessing the legitimacy of a check presented for cash or deposit, in order to protect itself and its customers from fraud. (*See* Placing a Reg CC Hold, ECF No. 54-20; Negotiable Instrument Decision Making Guide, ECF No. 54-23.) One of those policies, the guidelines for "Placing a Reg CC Hold," instructed employees to consider information such as the amount of the check, whether the check is "drawn off a local bank or out-of-market," whether the customer has sufficient "compensating funds" in their account, when the account was opened, the number of times the account was overdrawn, and the average account balance. (Placing a Reg CC Hold, PageID.601.) For checks over $1,000.00, the policy instructed employees to conduct a "deeper dive." (*Id.*)

Another policy, the Negotiable Instrument Decision Making Guide, provided a list of questions to ask "[w]hen a customer presents an item that seems out of the 'norm' or does not seem 'reasonable' for what the Bank knows about the customer, the customer's account history

and total customer relationship[.]" (Negotiable Instrument Decision Making Guide, PageID.625.) It instructed the employee to "engage the customer in a discussion" in order to learn more information that would "protect the customer and the Bank from loss." (*Id.*) The employee should tell such customers that Horizon was "aware of many different types of fraud happening around us," and the employee should ask questions like the following: "Are you familiar with the person or business that sent you this check?" and "Were you advised that you won a sweepstakes or lottery?" (*Id.*) If the employee had "[r]eason to doubt collectability," the bank could place a hold to delay the availability of funds from the deposit. (*Id.*)

Betker questioned whether Branscumb's check was authentic, telling Branscumb there was "so much different fraud going on" and that Branscumb "should be aware of things like that." (Branscumb Dep. 33.) Branscumb explained that the check was a settlement check that she had received from her lawyer's office. (*Id.* at 34.) Betker responded, "[W]ell, you do know if it came in the mail it's not real, right?" (*Id.*) Branscumb went ahead and deposited the check. Betker said that $225 would be available to Branscumb immediately, $5,300 would be available on March 25, 2022, and the remaining $17,091.14 would be available on April 1, 2022. (*Id.* at 34, 38-39.) These conditions were documented in a "deposit hold notice" entered that same day. (Deposit Hold Notice, ECF No. 54-7; Kearney Dep. 16, ECF No. 56-9.) Also, these conditions were consistent with the terms of Branscumb's account for large check deposits, i.e., deposits greater than $5,525 on a single day. (*See* Deposit Account Terms, ECF No. 54-8, PageID.450.) Those terms provided that Horizon would make the first $225 of a deposit available the same business day, but "[i]n some cases," the availability of remaining funds would be delayed. (*Id.*) Those circumstances included the following:

> We believe a check you deposited will not be paid.
> You deposit checks totaling more than $5,525 in one day.

3

. . .
You have overdrawn your account repeatedly in the last six months.

(*Id.*)

### B. Horizon Suspends Branscumb's Debit Card & Savings Account (March 25, 2022)

On March 25, 2022, Danyele English, a deposit operations clerk for Horizon, reviewed automatically generated, daily "close reports" and saw that Branscumb's savings account had been negative for over 25 days. (English Dep. 8-9, ECF No. 54-22; *see* Account Statements, PageID.471, 474 (showing negative account balances on February 28 and March 22).) She confirmed that the account was still negative, so she suspended both the savings account and Branscumb's debit card, which was tied to that account.[1] (*Id.* at 9-10, 15.) English had never met, seen, or spoken with Branscumb and did not know her race. (*Id.* at 14.)

### C. Horizon Refuses Branscumb's Request to Withdraw $5,000 (March 26, 2022)

On Saturday, March 26, 2022, Branscumb called the Niles Road branch and confirmed with Ciara Kearney, a teller at that branch, that $5,300 would be available for withdrawal. (Kearney Dep. 18.) Branscumb's friend Shameka Marlowe took her to a Horizon branch located in Benton Harbor, Michigan, to withdraw some of those funds. (Branscumb Dep. 40-41.) Marlowe pulled up to the drive-through window at the bank. (*Id.* at 43.) Branscumb was in the passenger seat. (*Id.* at 44.) Branscumb gave her driver's license and debit card to Michelle Shuey, a customer service representative who was working the teller window that day. Branscumb said that she wanted to make a withdrawal for $5,000. (*Id.* at 45.) Shuey left the window for about five minutes. (*Id.* at 48.)

---

[1] Branscumb deposited the settlement check to her checking account, so that deposit did not impact her savings account. (*See* Account Statements, PageID.473.)

4

While away from the window, Shuey checked Branscumb's checking account and spotted some "red flags" in Branscumb's request. (Shuey Dep. 13-14, ECF Nos. 54-17, 56-10.) The withdrawal request was for a "larger" amount. (*Id.* at 13.) It was based on a recent check deposit that was unlike any other that Branscumb had ever deposited to her account. (*Id.* at 14.) If the check was returned, Branscumb would not have funds to cover the withdrawal. (*Id.*) Shuey also looked at a copy of the check and noted that it was from an "out-of-market business," meaning a business from out of state or from the other side of the state.[2] (*Id.*) Branscumb had never before received a check from that source. (*Id.*) Shuey saw that Betker had handled the initial deposit, so Shuey called Betker for more information.[3] (*Id.* at 17.) Betker told Shuey that she had placed a hold on the deposit because it was a large check. (*Id.*) Shuey went to her manager, Alexis Harris, to review and approve the transaction. (*Id.* at 18.)

Shuey returned to the teller window with Harris,[4] who was "irate," according to Branscumb. (Branscumb Dep. 46, 48.) Holding Branscumb's driver's license, Harris asked Branscumb, "[W]hat did you say your name was?" (*Id.*) Branscumb asked if there was a problem. (*Id.* at 47.) Harris asked Branscumb about the source of the funds. (Harris Dep. 22, ECF Nos. 54-18, 56-7.) Branscumb said the check came from her lawyer's office and that it was for the settlement of a lawsuit. (Marlowe Aff., ECF No. 56-5.) While Harris was talking to Branscumb, Shuey ran the check through "Verafin," a third-party system that, among other things, verifies bank and routing information on a check to make sure the check is legitimate. (Shuey Dep. 19-

---

[2] The check identified the issuer as "Sun Communities Operating LP" and "Sun Homes Services, Inc.," located in Southfield, Michigan, on the east side of the state. (Settlement Check, ECF No. 56-2, PageID.692.) A sheet attached to the check described its purpose as "Other Manny Monsegur-Branscumb sett[.]" (*Id.*)

[3] Shuey also testified that she asked Branscumb questions about the check and that Branscumb refused to answer (Shuey Dep. 14), but Branscumb avers that this did not occur (Branscumb Aff., ECF No. 56-4). Because this evidence presents a factual dispute, the Court will accept Branscumb's version of what happened.

[4] Like Branscumb, Harris is African American.

5

20, 33; Harris Dep. 42.)  The system alerted Shuey that the check was a "high risk transaction" or that there may have been "fraud on the account before." (*Id.* at 21.)  She showed this information to Harris.  (*Id.* at 22.)  Harris then told Branscumb that "the check looks suspicious." (Branscumb Dep. 47.)   Harris said the bank could not give "any money off this check" because it is "fraudulent." (*Id.*)  Shuey then wrote to Betker and told her to not release funds from the check because it came up as "fraudulent" in Verafin.  (Shuey Dep. 25; 3/26/2022 Shuey-Betker Chat Log, ECF No. 54-25, PageID.630.)   Harris then froze Branscumb's checking account.  (Harris Dep. 26; Transaction Account Maintenance Log, ECF No. 54-12, PageID.482.)

Marlowe and Branscumb drove away from the teller window and pulled into the parking lot, where Branscumb called Betker and explained the situation.  (Branscumb Dep. 52.)   Betker told Branscumb "there was nothing she could do." (*Id.*)   Branscumb explained that the bank manager had said her check was fraudulent.  Betker replied, "[Y]ou have never deposited a check this large." (*Id.*)  Seeking assistance, Branscumb called her attorney and left messages for him. (*Id.* at 56.)

**D. Horizon Allows Branscumb to Withdraw Funds (March 28, 2022)**

The following Monday, March 28, Branscumb returned to the Niles Road branch in St. Joseph and spoke with the branch manager, Monica Ward.  (*Id.* at 55; Ward Dep. 10, ECF No. 54-27.)   Branscumb provided Ward with copies of the lawsuit settlement documents, which verified the source of the funds.  (*Id.* at 84; Ward Dep. 12.)  Ward also mentioned that she had spoken with Branscumb's attorney.  (*Id.*)  Ward then contacted the bank's fraud department, asking it to release the hold on Branscumb's account and to release the funds.  (3/28/2022 Ward Email, ECF No. 54-24, PageID.627.)  The fraud department apparently did so because Branscumb was able to withdraw $15,000 that same day.  (Branscumb Dep. 55-56.)  She was not able to withdraw more money because the bank did not have sufficient funds available at the time.  (*Id.* at 55.)  She

6

also transferred $1,000 to her savings account, remedying the negative balance in that account. (Account Statements, PageID.474.)  Three days later, Branscumb withdrew another $5,000 from her checking account.  (Branscumb Dep. 54-55.)

### E. Horizon Reactivates Branscumb's Debit Card & Savings Account (April 1, 2022)

After March 28, Branscumb noticed that she could not check the status of her account online and the debit card connected to her savings account would not work.  (*Id.* at 60-61.)  On April 1, she called Horizon's customer service department to address these issues.  (*Id.* at 61.)  That call was recorded.  A customer service agent explained to Branscumb that her debit card had been suspended because Branscumb was "overdrafted for 25 days consecutively."  (4/1/2022 Phone Call Tr., ECF No. 54-16, PageID.502.)  The agent told Branscumb that she was going to look up when Branscumb last received a deposit and, "if it's good," restore Branscumb's card.  (*Id.*, PageID.503.)  Branscumb responded that "[i]t's been established that it's good."  (*Id.*)  The agent said she still needed to verify that and then told Branscumb she was "good to go."  (*Id.*)  Branscumb ended the call.  (Branscumb Dep. 61.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

7

### III. ANALYSIS

Branscumb asserts claims for race discrimination under 42 U.S.C. § 1981 and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, et seq.  Specifically, she claims that Horizon discriminated against her on account of race—impairing her right to make and enforce contracts with Horizon and denying her the full enjoyment of Horizon's services—on March 23, 26, and 28, 2022, by preventing her from withdrawing the full amount of her check and freezing her account.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  To prevail on such a claim, Branscumb must establish

> (1) that "[s]he belongs to an identifiable class of persons who are subject to discrimination based on their race;" (2) that "the defendant intended to discriminate against [her] based on [her] race;" and (3) that "the defendant's discriminatory conduct abridged [her] right to contract."

*Gray v. AutoZoners, LLC*, No. 22-1069, 2022 WL 16942609, at *3 (6th Cir. Nov. 15, 2022) (quoting *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006)).  Similarly, ELCRA provides that, except when permitted by law, "a person shall not '[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of . . . race[.]'"  *Id.* (quoting Mich. Comp. Laws § 37.2302(a)).

The parties' dispute centers on whether Horizon intended to discriminate against Branscumb.  She may establish discriminatory intent through direct or circumstantial evidence. *Id.*  Branscumb relies on circumstantial evidence.  In such a situation, "courts generally evaluate § 1981 and ELCRA discrimination claims under the same standard as Title VII of the Civil Rights Act of 1964."  *Id.*  In other words, courts use the burden-shifting standard of proof established in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  This standard "requires a plaintiff to 'first establish a prima facie claim of discrimination.'"  *Gray*, 2022 WL 1694260, at *4 (quoting *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001)).  If the plaintiff establishes her prima facie case, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its actions."  *Christian*, 252 F.3d at 868.  If the defendant satisfies its burden, the plaintiff "must establish that the nondiscriminatory reason proffered by the [defendant] is a pretext for discrimination."  *Gray*, 2022 WL 1694260, at *4.

Horizon argues that Branscumb cannot establish a prima facie case, that it had legitimate, nondiscriminatory reasons for its actions, and that Branscumb cannot establish pretext.

Branscumb's claim concerns her interactions with a commercial establishment rather than discrimination in her employment.

> To establish a prima facie case of discrimination in a commercial establishment, plaintiff[] must show that: (1) [she is] a member of a protected class; (2) [she] made [herself] "available to receive and pay for services ordinarily provided by the defendant to all members of the public in the manner in which they are ordinarily provided; and" (3) [she] "did not enjoy the privileges and benefits of the contract . . . under factual circumstances which rationally support an inference of unlawful discrimination."

*Id.* (quoting *Christian*, 252 F.3d at 871).

Horizon argues that Branscumb cannot establish the third element of a prima facie case, i.e., circumstances supporting an inference of unlawful discrimination.  She can establish this element in one of two ways.  She can show either "(a) that [she] was deprived of services while similarly situated persons outside the protected class were not deprived of those services, or (b) that [she] received services in a 'markedly hostile manner' that 'a reasonable person would find objectively discriminatory.'"  *Id.* (quoting *Christian*, 252 F.3d at 872).

To prevail under a "similarly situated person theory," Branscumb "must identify a comparator person 'of a different race, who was similarly situated to [her], but who was treated

9

better' by [the] defendant." *Id.* (quoting *Smith v. City of Toledo*, 13 F.4th 508, 515 (6th Cir. 2021)). Alternatively, under the "markedly hostile treatment" theory, the Court "considers factors including whether service is so contrary to the establishment's financial interests, so far outside of widely acceptable business norms, and so arbitrary on its face that it supports a rational inference of discrimination." *Id.* Branscumb relies on the latter theory, arguing that the evidence shows she received services in a markedly hostile manner. (Pl.'s Resp. Br. 6, ECF No. 56.)

What counts as a markedly hostile manner of providing services? Several opinions from the Court of Appeals are instructive. In *Christian*, the plaintiff was shopping in the defendant's store when a store employee fabricated a shoplifting incident, falsely reporting the plaintiff for shoplifting, which forced the plaintiff to leave the store. *Christian*, 252 F.3d at 875, 878. The employee's conduct, if true, was markedly hostile because it was profoundly contrary to the defendant's financial interests and far outside of widely acceptable business norms. *Id.* at 879.

In *Keck v. Graham Hotel Systems, Inc.*, 566 F.3d 634 (6th Cir. 2009), a hotel would not complete a contract with the plaintiffs to host a wedding reception, even though the plaintiffs

> made numerous walk-in visits and telephone calls, filled out Inquiry Forms, put two separate ten-day holds on their desired reception date, and three times offered in-person to pay the $1,200 deposit and sign the contract, which would have required them to spend a minimum of $12,000 in food and beverages through the Hotel for the reception.

*Id.* at 641. These facts were sufficient for a jury to conclude that the hotel's conduct was profoundly contrary to its financial interests and outside of widely acceptable business norms. *Id.*

The Court will apply these standards to the incidents at issue in the complaint.[5]

---

[5] The parties do not cite, and the Court cannot find, Michigan case law applying the markedly hostile theory to an ELCRA claim. Because the parties' briefing apparently assumes that this standard applies to that claim, the Court will make the same assumption.

### A. March 23 deposit

As evidence of hostile treatment in connection with the initial deposit transaction on March 23, Branscumb relies on Betker's statement to the effect that if Branscumb's check came in the mail, it was not real. There is nothing hostile in such a statement. A jury could construe it as suspicion about the validity of Branscumb's check, but that suspicion was reasonable because the check was for a substantial sum of money. Branscumb's explanation that she received it as a settlement payment would do little to dispel those suspicions, as would the fact that the word "sett" (or "settlement") appeared on a sheet attached to the check. Furthermore, Betker ultimately accepted the check for deposit, with a temporary hold. That hold was consistent with Horizon's financial interests. It was also consistent with Horizon's policies and the terms of Branscumb's account for checks over $5,525. No evidence suggests that the hold was so arbitrary, so contrary to Horizon's interests, or so far outside of widely acceptable business norms that a jury could infer discrimination against Branscumb because of her race. Thus, Branscumb has failed to establish her prima facie case as to the March 23 deposit.

### B. March 25 suspension of debit card

The undisputed evidence shows that English, an individual with no knowledge of Branscumb's race, suspended Branscumb's savings account and debit card based on an automated report that she received about a negative balance in Branscumb's account. Thus, no reasonable jury could infer that the suspension of Branscumb's debit card and savings account was motivated by her race.

### C. March 26 refusal to provide funds

As evidence of hostility in connection with Harris and Shuey's refusal to provide $5,000 to Branscumb from her checking account, Branscumb relies on the fact that Harris asked Branscumb for her name—despite the fact that Harris possessed Branscumb's identification—and

11

then called Branscumb's check "fraudulent" even after Branscumb explained that the check came from the settlement of a lawsuit. While a jury could construe Harris's statements as unnecessary and unwarranted, they were not so contrary to Horizon's financial interests or outside the scope of acceptable business practices to suggest racial discrimination. Like Betker's statement, they reflected suspicion about the validity of Branscumb's deposit and the ability of the bank to recoup the funds Branscumb requested. That suspicion was reasonable under the circumstances.

There is no dispute that, as Shuey recognized at the time, Branscumb had requested a large withdrawal based almost entirely upon a check that she had deposited only a few days earlier. In other words, she did not have sufficient funds in her account to compensate Horizon for the withdrawal should the check prove to be invalid. Also, a deposit of that size was unusual for Branscumb's account. And although Branscumb claimed she had received the check from her attorney for a settlement, nothing on the face of the check supported that contention, apart from a vague reference to "sett." Moreover, the check identified the issuer as two businesses located on the other side of the state. These facts are the sort of red flags that Horizon expressly instructed its employees to identify and investigate under its Reg CC Hold policy.

In addition, it is not disputed that Shuey investigated the check further through Verafin, which returned results suggesting that the check was a high-risk transaction or was potentially fraudulent. This information gave Shuey and Harris additional reason to refuse Branscumb's request. Branscumb argues that the evidence from Verafin is inadmissible hearsay. But hearsay is a statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c)(2). Horizon does not offer Shuey's testimony about the results from Verafin as evidence that Branscumb's check was, in fact, fraudulent. Instead, it offers that testimony as evidence of what Shuey (and by extension, Harris) reasonably perceived to be true at the time. Thus, this testimony

is not hearsay. And although Branscumb claims that this testimony is false, she offers no evidence to dispute it. Branscumb asks the Court to disregard their testimony because it is not credible, but the Court's role at this stage is to determine whether there is a genuine dispute of fact; the Court does not weigh evidence to determine whether it is credible.

When assessing whether conduct is markedly hostile, one factor the Court considers is whether the conduct is outside widely acceptable business norms. Here, Branscumb argues that the rejection of her request to withdraw funds was outside of Horizon's normal business procedure. Its standard procedure, Branscumb contends, was to make $5,300 in funds available after the second business day; it did not follow this protocol when refusing Branscumb's request for funds on March 26. (*See* Harris Dep. 49-50 (testifying that it was Horizon's standard procedure for large deposits to make $5,300 available on the second business day).)

But while a jury could infer that it was Horizon's standard procedure to release $5,300 in funds from a deposit larger than $5,525 after the second business day, no evidence suggests that it was standard procedure to do so in the face of identified concerns arising from the customer's account history and the validity of the deposited check. To the contrary, the Deposit Hold Notice expressly states that Horizon might hold the "entire amount" of a deposit until the seventh business day in some circumstances, including where the customer has "overdrawn [their] account repeatedly in the last six months" or where there is "doubtful collectability – potentially fraudulent item." (Deposit Hold Notice.) Here, Branscumb's account history (including a lack of compensating funds and no previous history of such a large check deposit), the source of the funds (an out-of-market business), and the results from Verafin gave Shuey and Harris ample reason to doubt the collectability of Branscumb's check and to then prevent her from making a $5,000

13

withdrawal on that check pending further investigation. In other words, their conduct was consistent with Horizon's written procedures.

But even if Branscumb had shown that Horizon departed from its standard procedure by temporarily delaying Branscumb's ability to withdraw funds, that delay was not arbitrary, or contrary to widely acceptable business practices, or contrary to Horizon's financial interests. Because Branscumb did not have other funds to compensate the bank, the delay protected the bank from the possibility that the check was invalid. It also protected Branscumb because she would have been liable to Horizon if it did not receive the funds from the check. Thus, Branscumb failed to provide evidence that Horizon's modest departure from the procedure for large deposits was so arbitrary that a jury could infer racial discrimination.

In summary, a reasonable jury could not infer that declining to accept Branscumb's withdrawal request and putting a hold on her account in these circumstances was either arbitrary, contrary to Horizon's financial interests, or so far outside of widely accepted business practices that it would give rise to an inference of discrimination. In other words, Branscumb has not established her prima facie case because she has not shown that the treatment she received was markedly hostile.

Even assuming Branscumb has established a prima facie case, her claims would still fail. Horizon has provided legitimate, nondiscriminatory reasons for delaying Branscumb's access to her funds. The concerns identified by Shuey and Harris gave them reason to believe that allowing Branscumb to withdraw $5,000 only three days after depositing an unusually large check to a nearly empty account was a financial risk for Horizon. Branscumb's verbal explanation that the check was a settlement payment would do little to alleviate those concerns.

Thus, assuming the existence of a prima facie case, the burden would shift to Branscumb to offer evidence that Horizon's reasons were a pretext for discrimination. Broadly speaking, Branscumb can meet this burden by demonstrating: "that the proffered reason (1) has no basis in fact, (2) did not actually motivate [D]efendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007). She has not met this burden.

Branscumb argues that Horizon's departure from standard procedure is evidence of pretext. In other words, she contends that Horizon's standard procedure for a large deposit was to make $5,300 available two business days after that deposit. As discussed above, however, Horizon has demonstrated that Branscumb's transaction raised specific concerns that would not have been common to all large deposits. Those concerns, and Horizon's responses to them, were consistent with Horizon's policies and with the terms of Branscumb's account. Thus, a reasonable jury could not find that a departure from the general policy for large deposits warranted an inference of pretext or discrimination in Branscumb's case.

Branscumb also argues that a jury could infer that Shuey and Harris had discriminatory animus because they purportedly provided false or contradictory testimony about their interactions with Branscumb at the teller window. According to Shuey, she asked Branscumb questions about the check and Branscumb responded, "It's none of your business." (Shuey Dep. 14.) Branscumb, however, contends in an affidavit that Shuey did *not* ask her questions about the check and that Branscumb did *not* tell Shuey "It's none of your business." (Branscumb Aff., PageID.687.) And at one point in her deposition testimony, Harris denied telling Branscumb that her check was fraudulent (Harris Dep. 33), whereas Branscumb testified that this is what Harris said to her.

15

Branscumb relies on the principle that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). But even if portions of Harris and Shuey's testimony about their conversations with Branscumb were false, that false testimony does not suggest that Horizon's *asserted justifications* for delaying release of Branscumb's funds were false or were a pretext for discrimination. For instance, Horizon does not contend that it delayed access to her funds solely because she would not answer Shuey's questions. Instead, it contends that Shuey and Harris noticed several red flags in connection with Branscumb's request. Branscumb has not shown that these concerns were false. True, the check was not fraudulent, as Shuey and Harris purportedly believed based on the Verafin search, but there is no genuine dispute about the other red flags identified by Shuey before conducting that search, or about the Verafin search results that would have raised additional suspicions about the check. Thus, although Branscumb identifies several factual disputes, those disputes are not material to the disposition of her claim.

Branscumb also points to the following instant messaging conversation between Betker and Kearney on March 28, 2022, after Branscumb left the Benton Harbor branch unable to withdraw the $5,000 she had requested.

> Betker:
> > so annoying that [Harris] restricted the account but [Branscumb] came over here
> Kearney:
> > yeah
> Betker:
> > from what [Shuey] said she wouldnt answer any of their questions
> Kearney:
> > >.> well maybe she needed time to figure out lies? unless the check isnt fraudulent which [I] doubt because of what you googled
> Betker:
> > [Ward] thinks it looks legit

16

>    Kearney:
>    
>     ..........
>    Betker:
>     she said it was from a settlement
>    Kearney:
>     mmmmmmmm
>     idk man
>     we cant do anything until bsa looks into it more

(Kearney-Betker Messages, ECF No. 56-3, PageID.694-695.)

Branscumb focuses on Kearney's accusation that Branscumb needed time to "figure out lies" about the check. However, Kearney's comments are irrelevant because she did not play any role in the decision to deny Branscumb access to her funds or her account. Thus, Kearney's statements do not provide evidence of Horizon's intent. *See Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 994 (6th Cir. 2009) ("Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself cannot suffice to satisfy the plaintiff's burden . . . of demonstrating animus." (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009))); *Tooson v. Roadway Express, Inc.*, 47 F. App'x 370, 375 (6th Cir. 2002) ("We . . . can find no support in *Hopkins* for the proposition that the remarks of individuals without any decisionmaking authority over the plaintiff can provide evidence of discriminatory intent.").

Finally, Branscumb points to a remark that Harris made about Branscumb in an email to Ward on March 28. Harris described Branscumb as being "really snippy" when Harris and Shuey asked Branscumb about the check. (3/28/2022 Harris Email, ECF No. 54-24, PageID.627.) This stray remark does not suggest pretext or a racially discriminatory animus toward Branscumb. Accordingly, it does not save Branscumb's claim.

In short, for all the foregoing reasons, Horizon is entitled to summary judgment for Branscumb's claim regarding Horizon's refusal to release funds on March 26.

**D. Access to Debit Card**

Branscumb complains that she was not able to use the debit card attached to her savings account or access her account online for a few days after withdrawing her funds from her checking account. As discussed above, Horizon suspended her savings account for reasons unrelated to her race. When Branscumb called Horizon about the issue, it reactivated her account. Branscumb provides no evidence that Horizon took any action in relation to her debit card and savings account because of her race.

In summary, Branscumb has failed to provide evidence that would permit a jury to infer that Horizon discriminated against her because of her race.

## IV. CONCLUSION

For the reasons herein, the Court will grant Horizon's motion for summary judgment and dismiss the case. The Court will enter an order and judgment in accordance with this Opinion.

Dated: March 19, 2024                    /s/ Hala Y. Jarbou
                                         HALA Y. JARBOU
                                         CHIEF UNITED STATES DISTRICT JUDGE